O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Daniel Christopher Brown,<br><br>            Petitioner,<br><br>      vs.<br><br>Domingo Uribe, Jr.,<br><br>            Respondent. | CASE NO. CV09-5068-JST (DTB)<br><br>**ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS BROUGHT PURSUANT TO 28 U.S.C. § 2254** |

## I.   INTRODUCTION

Before the court is the Petition for Writ of Habeas Corpus ("Petition") filed by Petitioner Daniel Christopher Brown, a state prisoner who is proceeding pro se.  The Petition is brought pursuant to 28 U.S.C. § 2254 ("§ 2254").  Its sole claim is that the trial court erred when it denied Petitioner's rights under the Sixth Amendment pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986).  (Petition at ¶7.a.).  The California Court of Appeal upheld the trial court's decision and the California Supreme Court denied review.  The California Court of Appeal's decision to uphold the trial court's denial of the defense's *Batson* motion was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts, so the Petition is denied and dismissed with prejudice.

While this decision was pending, Petitioner filed a Motion for Stay and Abeyance requesting that the court add three new claims to the Petition: 1) the trial court improperly imposed consecutive sentences, 2) trial counsel rendered ineffective assistance by failing to object to the imposition of consecutive sentences; and 3) trial counsel rendered ineffective assistance by failing to bring a motion to sever Petitioner's trial from that of his co-defendant.  (Doc. 16 at 2–3.)  The Court denied this motion on February 22, 2010, finding that the claims did not "relate back" to the *Batson* claim, as required under *Mayle v. Felix*, 545 U.S. 644 (2005), and could therefore not be attached without first being exhausted in state court, an impossibility because they had become time-barred.  (Doc. 16 at 2–3.)

## II. PROCEDURAL HISTORY

In 2007, a Los Angeles Superior Court jury found Petitioner guilty of three counts of attempted second degree robbery.  The jury also found true the sentence enhancement allegations that Petitioner was armed with and personally used a firearm.  (*See* Clerk's Transcript on Appeal ["CT"] 129–31; 5 Reporter's Transcript on Appeal ["RT"] 1169–70.)

The trial court sentenced Petitioner to state prison for a determinate term of 20 years. (CT 143–44; 5 RT 1210–11.)

Petitioner appealed his conviction and sentence to the California Court of Appeal raising, *inter alia*, a claim generally corresponding to the *Batson* claim alleged in his federal habeas petition at issue here. (Respondent's Notice of Lodgment ["Lodgment"] A.) In an unpublished decision filed on January 29, 2008, the California Court of Appeal rejected Petitioner's claims and affirmed the judgment. (*Id.* D.) Petitioner's ensuing petition for review to the California Supreme Court raising the same claims was summarily denied without comment or citation of authority on April 9, 2008. (*Id.* E, F.) Petitioner raised no collateral challenges to his conviction in state court.

In July of 2009, Petitioner filed the Petition for Writ of Habeas Corpus by a Person in State Custody considered here. For purposes of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court evaluates "the state court's last reasoned decision as the basis for the state court's judgment," that of the California Court of Appeal in this case. *Ali v. Hickman*, 584 F.3d 1174, 1181 n.5 (9th Cir. 2009).

## III.    SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Because Petitioner is not challenging the sufficiency of the evidence to support his conviction, the following summary is taken from the "Facts" section of the California Court of Appeal opinion:[1]

---

[1] The Court notes that recent Ninth Circuit cases have accorded the factual summary set forth in a state court opinion a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *See Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Slovik v. Yates*, 545 F.3d 1181, 1183 n.1 (9th Cir. 2008); *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 926 (2009). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Tilcock*, 538 F.3d at 1141. Here, Petitioner does not contest the underlying facts and has not attempted to overcome the presumption with respect to them.

**A. Prosecution Evidence**

At 1:00 a.m. on March 3, 2006, Roque Santos was driving home in his red Astro van. When he left the van to open a gate, an African-American man pointed a gun at him, told him to walk away, and took the van.

At approximately 8:00 a.m. on March [3], 2006, an A.T. Systems armored car carrying more than $30 million arrived at a branch office of the Farmers & Merchant Bank in Long Beach. Gabriel Perez drove the armored car, which also contained Jaime Arrieta. Accompanying the armored car was a marked A.T. Systems "chase" truck driven by Anthony Del Valle. Del Valle was assigned to protect Arrieta, who acted as a "hopper," that is, transported money to and from the armored car when it made stops.

It was raining as Perez backed the armored car up to within a few feet of the bank door. Del Valle parked his truck nearby. After the bank manager unlocked the bank door, Arrieta and Del Valle moved money from the armored car into the bank. In accordance with A.T. Systems procedure, Perez remained in the armored car. Inside the bank, Arrieta and Del Valle collected money that they were to transport elsewhere, and Arrieta pushed a cart bearing the money outside to the armored car.

Arrieta testified as follows: While Del Valle stood inside the bank and held the door open for him, Arrieta moved the cart to the rear of the armored car. A man wearing a mask—who was identified by other witnesses as [Petitioner]—approached Arrieta, pointed a rifle at his chest, and said, "'Give me the money.'" A second masked man also appeared and pointed a rifle at Arrieta. Del Valle emerged from the bank and fired his

4

gun at the two men, hitting [Petitioner] three times in the stomach. [Petitioner] fell to the ground while his accomplice ran to a red or burgundy van, accompanied by a third man. The two men entered the van and drove away. The armored car also left.

Del Valle testified that after he opened the bank door for Arrieta's cart, he retreated momentarily into the bank to retrieve his umbrella. From within the bank he looked through the door—which had remained open—and saw three armed men confront Arrieta. He fired his gun at the three men. The man closest to Arrieta fell down, and the other two men fled in a red van.

Perez testified that after Arrieta left the armored car, he remained in the driver's seat looking over paperwork. He noticed three men dressed in black running toward the armored car, and shouted an alarm to Arrieta. He soon heard Arrieta scream, "Take whatever you want," followed by shots. When he saw two of the men running from the armored car, he surmised that the third man had entered the open rear door of the armored car. Perez drove the armored car away from the bank to find help and to "bounce [the third man] around until he was out of [the armored car]." Perez saw the two fleeing men enter a red van, which he unsuccessfully tried to intercept. He then returned to the bank.

Susan Stencil, who operates a business near the bank, testified as follows: While she was standing across the street from the bank, she saw the armored car, and noticed a red or "maroonish" van drive slowly by the front of the bank. The van soon returned and stopped in the middle of the street. A black man wearing a mask and carrying a rifle left the van and walked quickly toward the armored car, followed by two more men from the van. She took cover behind a truck and heard shots.

Investigating officers found two loaded rifles outside the bank. They also discovered Santos's van in an alleyway in Long Beach. [Derrick Adams] Willie's[2] fingerprints matched prints on a gun found in the van, and DNA testing identified Willie as a probable source of genetic material on the gun.[3] When Willie was arrested, he stated that he was a member of the East Coast Crips gang.

**B. Defense Evidence**

Long Beach Police Officer Asif Khan testified that he and his partner arrived at the bank at approximately 8:30 a.m. on March 3, [2]006.[4] According to Khan, the scene was "very chaotic." The officers found [Petitioner], who was wounded, as well as numerous shell casings and two long-barreled rifles. Khan interviewed Perez and Arrieta, each of whom said that the three perpetrators had long-barreled guns.

Long Beach Police Detective Steven Prell testified that when he arrived at the bank on the date of the crime, he directed a technician to place numbers on shell casings found at the site.[5] Approximate[ly] 48 Long Beach police officers and three FBI agents were present when he arrived.[6]

---

[2] Derrick Adams Willie was Daniel Christopher Brown's codefendant. Willie was charged with other offenses in addition to the robbery charge, including the allegation under California Penal Code § 186.22, subdivison (b)(1)(A) that all of his offenses had been committed in association with a criminal street gang. (Lodgment D at 2.) Willie was not a party to Mr. Brown's state court appeal.

[3] Fresh bloodstains were also found in the van. DNA testing on the blood stains led the investigation officers to arrest Darrell Slack as [Petitioner's] and Willie's accomplice.

[4] Kahn was offered as a witness on behalf of Willie.

[5] Prell was offered as a witness on behalf of [Petitioner].

[6] The prosecutor presented brief rebuttal testimony from Perez and Del Valle. Perez testified that he did not tell investigating officers that each perpetrator had a long-barreled gun, and Del Valle reaffirmed that he saw two long-barreled guns. Del Valle also stated that no one had asked him for money.

(Lodgment D at 3–5.)

### IV. LEGAL STANDARD

The standard of review applicable to Petitioner's claim is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim—(1) resulted in a decision that was contrary to,
> or involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or (2) resulted in a
> decision that was based on an unreasonable determination of the facts in light
> of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 405, 412-13. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405–06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal

habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable application*' of clearly established federal law, or are based on 'an *unreasonable determination* of the facts.'" *Early*, 537 U.S. at 11 (quoting 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406–10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24–27 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24–27; *Williams*, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409–10; see also *Visciotti*, 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

## V. DISCUSSION

Petitioner contends that his federal constitutional rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), were violated when the prosecutor exercised a peremptory strike against an African-American venire member, Juror No. 9 (the "Juror"). (Petition at ¶7.a.)

### A. The Record Below

The Juror indicated during voir dire that she was a physical therapist whose ex-husband was a paramedic who died in the line of duty from fire and smoke inhalation and a cardiac issue. (1 RT 203.) She had four minor children and had previously sat on a

murder case that resulted in a hung jury.  (*Id.*)  When the Court inquired of her whether the jurors in the murder case had acted reasonably and honestly and had done their best to reach a verdict in that case, she replied, "I did."  (*Id.*)  She relayed that she had a relative and a neighbor in the Los Angeles County Sheriff's Department, (1 RT 205,) that her cousin was a career criminal in prison for armed robbery following his third strike, (1 RT 206,) that another cousin had been incarcerated (and since released) for vehicular manslaughter, (*id.*,) and that her car had been vandalized the year prior.  (1 RT 207.)  She had a history of working in a trauma center where gang members were patients, but she had had no particular problems with them.  (1 RT 209.)  In response to the prosecutor's questions regarding her experience with gang members in the trauma center, she indicated that she had treated Crips and that they "did not really mind telling you they are affiliated with a gang."  (1 RT 217.)  When asked how she felt about gangs, she responded that that they "do a lot that's wrong and disrupt society." (1 RT 218.)

The prosecutor exercised a peremptory challenge against the Juror.  (2 RT 257.) The defense made a *Wheeler*[7] motion, contending that the only reason the prospective juror was being removed from the jury was because she was a black female.  (2 RT 258.) Petitioner's counsel stated that the prosecutor had "arbitrarily" removed a black male previously.  (*Id.*)  Petitioner's co-defendant's counsel joined the *Wheeler* motion and noted that the Juror and the previously-removed black male were the only two black people in the entire jury pool.  (*Id.*)  The trial court initially agreed with this, but the prosecutor pointed out that there was an elderly black man still sitting in the jury pool and Petitioner's counsel confirmed this.  (2 RT at 258–59.)  Petitioner's counsel argued that there was "nothing shown [sic] she can't be a fair and impartial juror" and that the prosecutor had not

---

[7] The Ninth Circuit has held that, "'[i]n California, a *Wheeler* motion is the procedural equivalent of a federal *Batson* challenge.'"  *Fernandez v. Roe*, 286 F.3d 1073, 1075 (9th Cir. 2002) (quoting *Tolbert v. Gomez*, 190 F.3d 985, 987 (9th Cir. 1999)); *see also Paulino v. Castro*, 371 F.3d 1083, 1088 n.4 (9th Cir. 2004) (defendant's objection under *Wheeler* at trial preserved his *Batson* claim).

even questioned her regarding her ability to act fairly. (2 RT 259.) Petitioner's counsel noted that the prosecutor had not "interrogated" the Juror like she had prospective juror no. 16 ("Juror No. 16"), a black male. (*Id.*) She noted that Juror No. 16 "had a warrant and . . . a DUI or something like that that was 14 years old," that he had not been timely prosecuted, that he was arrested based on the warrant, and that that incident was the only criminal action on his record. (2 RT 259–60.) There was nothing, according to Petitioner's counsel, indicating that Juror No. 16 could not be a fair and impartial juror. (*Id.*) The court noted that Juror No. 16 had indicated he was a bartender or security agent and so he was armed in some fashion, and that he got into a dispute with somebody, and pleaded to disturbing the peace. (2 RT 260.) The prosecutor corrected the court, noting that Juror No. 16 never pleaded, but was arrested twice.[8] (*Id.*) The discussion then returned to the Juror. The court "was surprised" at the use of the peremptory against the Juror and asked the prosecutor to explain why the strike was not racially motivated. (2 RT 260.)

The prosecutor responded as follows:

> I will never keep a juror who has hung a serious case and states they hung because it—wasn't like the other juror who had hung and said that it was one juror who was not deliberating is what they said.[9] This juror hung. No matter what color she is, she hung. And she answered your question in a way that she was hung, and it was a 187, a very serious case.

---

[8] There was no *Wheeler* motion made with respect to Juror No. 16. However, the Court has included the discussion surrounding his dismissal since petitioner's counsel argued to the trial court, as evidence of the inappropriate removal of the Juror, that the prosecutor had also inappropriately dismissed Juror No. 16.

[9] The prosecutor is referring to a prospective juror who spoke about his experience on a hung jury in a shooting at an inhabited dwelling case. In response to the Court's question to that prospective juror regarding whether he believed the jurors acted reasonably and in good faith and whether they tried to reach a verdict, he responded that, "We had one juror who refused to cooperate." (1 RT 201.)

1    In addition, how her husband died doesn't make her a better juror.  He

2    wasn't shot.  That's irrelevant.  And she has two different cousins who have

3    been convicted of serious crimes, including robbery that was armed—that's

4    what this is about—and 192, some kind of manslaughter.

5    Not only that, she serves and helps Crips.  That is enough.  The hung

6    jury and serving and helping Crips—it is her obligation morally to treat

7    Crips and help them, as much as we the citizens have expressed not being

8    too fond of gang members.

9 (2 RT 260–61.)  The court inquired, "What's she supposed to do as a health practitioner

10 when a person is injured and happens to be a gang member?"  (2 RT 261.)  The prosecutor

11 responded:

12    She is supposed to serve and help Crips.  But I'm not gonna keep her as a

13    juror on a case where the allegation is he is a Crip.  That doesn't make sense.

14    She comes in contact with Crips more than once, from what she said.  So she

15    can't sit here and say—I don't know what they told her.  I don't know how

16    close she's gotten with any of them, but she is getting intimate when she is

17    treating them.

18 (*Id.*)  The court noted that the prosecutor had not asked the juror whether she was intimate

19 with the gang members.  (*Id.*)  The prosecutor responded, "She's a nurse, isn't she?"  (*Id.*)

20 Petitioner's counsel responded that the Juror was a physical therapist.  (*Id.*)  The

21 prosecutor then stated:

22    I mean intimate that way.  She is touching them, dealing with them.  And she

23    hung.  She hung on a serious case and didn't have the right answer that

24    would allow me to do my job properly and keep her.

25 (2 RT 261–62.)  When the trial court inquired what the "right" answer was, the prosecutor

26 stated:

27

28

The right answer is what the other juror said when you asked that—that's why you ask that question, your honor. The right answer was one juror—who was it who hung? And I kept them. One juror problem here—it was [the other prospective juror] hung a shooting, inhabited dwelling, very serious case, also, and it was hung because of one juror who refused to follow the law, I think he said—is what I believe he said.

(2 RT 262.) Petitioner's counsel responded that, "He said cooperate. That's a difference." (2 RT 262.) The prosecutor responded as follows:

I've had hung juries, and when I talked to them in the hallway, they said, 'I hung before. It was no big deal,' and that's what this hung juror told the other jurors and hung. I only need one basis. That's certainly—the People feel that's strong enough. But she's got a first cousin convicted of an armed robbery.

(2 RT 262.) When the court inquired whether that meant that none of the jurors that the prosecutor would accept on the panel would have friends or relatives with convictions, the prosecutor said, "No," and added that her cousin was convicted of an armed robbery, the same crime with which defendants were charged. (2 RT 262.) The prosecutor surmised that the Juror probably hung the jury in the murder trial and reiterated that "she treats gang members." (2 RT 262.)

The trial judge stated that the only legitimate basis that the prosecutor had proffered was that the juror was on a hung jury before. (2 RT 263–64.) Petitioner's counsel argued that they did not know whether the Juror was the "cause" of the hanging, and that maybe she was one of those who wanted to convict. (2 RT 263.) Petitioner's counsel maintained that "just because it hung doesn't mean that she is the one who hung it." (*Id.*) She further argued that the Juror was a physical therapist who could not pick and choose to whom to provide services, and that just because the person was a Crip or gang member did not mean that he was not entitled to physical therapy. (*Id.*)

The court ruled as follows:

> It's a facially valid reason for excusing a juror that he served on a prior case where the jury was deadlocked, and a reasonable and competent D.A. can use that as—and would use it, in my opinion, as a basis for excusing a juror regardless of race. So the motion is denied.

(2 RT 263–64.)

## B. Applicable Legal Authority

In *Batson*, the Supreme Court held that an African American defendant stated an Equal Protection claim based on allegations that the prosecutor at his trial had exercised peremptory strikes in a manner allegedly intended to prevent any African Americans from serving on the petit jury. 476 U.S. at 96–98. Under *Batson* and its progeny, courts apply a three-step analysis to claims of racial discrimination in the exercise of peremptory challenges:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Synder v. Louisiana*, 552 U.S. 472, 476–77 (2008); *Johnson v. California*, 545 U.S. 162, 168 (2005); *Purkett v. Elem*, 514 U.S. 765, 767 (1995); *see also Hernandez v. New York*, 500 U.S. 352, 358–59 (1991).

At the first step of the *Batson* inquiry, the defendant must show that: "(1) [T]he prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race." *Boyd v. Newland*, 467 F.3d 1139, 1143

13

(9th Cir. 2006); *see also J. E. B. v. Alabama Ex. Rel. T. B.*, 511 U.S. 127 (1994) (Equal Protection Clause also prohibits discrimination in jury selection on the basis of gender). "A defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.

At the second step of the *Batson* inquiry, i.e., once a prima facie case has been shown, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation" for the strike. *Purkett*, 514 U.S. at 767. The prosecutor need not offer a reason that is "persuasive, or even plausible," but it must be a reason that does not deny equal protection. *Id.* at 768; *see also Rice v. Collins*, 546 U.S. 333, 338 (2006) ("so long as the reason is not inherently discriminatory, it suffices"). "[A] prosecutor's 'failure to satisfy this burden to produce and explain the reason for her strike - for whatever reason - becomes evidence that is added to the inference of discrimination raised by the prima facie showing, but it does not end the inquiry.'" *Gonzalez v. Brown*, 585 F.3d 1202, 1208 (9th Cir. 2009) (quoting *Yee v. Duncan*, 463 F.3d 893, 899 (9th Cir. 2006)); *see also Johnson*, 545 U.S. at 171, 171 n.6 ("The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.") (internal quotation marks and citation omitted).

At the third step of the *Batson* inquiry, the Court has "the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. In making that determination, the Court is required to evaluate the "persuasiveness" of the prosecutor's articulated reasons. *See Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 338–39 (2003); *Purkett*, 514 U.S. at 768. The Court "must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476

U.S. at 93. The trial court has a duty to "decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination." *See Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008) (as amended).

The critical issue ultimately is the prosecutor's credibility. *See Hernandez*, 500 U.S. at 365 ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."); *Batson*, 476 U.S. at 98 n.21. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

The Court is not "bound to accept at face value [the prosecutor's] list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993). "The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny militates against the sufficiency of a valid reason." *McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir. 2000). Moreover, a comparative analysis of the challenged jurors and the non-challenged jurors may show that race-neutral reasons are a pretext for discrimination.[10] *See Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 240-41 (2005); *Cook v. Lamarque*, 593 F.3d 810, 815 (9th Cir. 2010); *Ali v. Hickman* 571 F.3d 902, 910 (9th Cir. 2009), amended by 584 F.3d 1174 (9th Cir. 2009); *Green*, 532 F.3d at 1030; *Kesser v. Cambra*, 465 F.3d 351, 357-58 (9th Cir. 2006);

---

[10] This analysis may be necessary at the first or third step of the *Batson* inquiry. *Boyd*, 467 F.3d at 1149–50.

15

1   *Mitleider v. Hall*, 391 F.3d 1039, 1047 n.5 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824,
2   830-31 (9th Cir. 2003).

3       The Ninth Circuit has also found that "[p]eremptory challenges cannot be lawfully
4   exercised against potential jurors of one race unless potential jurors of another race with
5   comparable characteristics are also challenged." *McClain*, 217 F.3d at 1221. Though the
6   California courts did not conduct a comparative juror analysis, this court must conduct the
7   analysis even in cases where the state court refused to do so. *See Kesser*, 465 F.3d at
8   361(finding that, "in *Miller-El*, the Court made clear that the comparative analysis is
9   required even when it was not requested or attempted in the state court.")

10

11  **C.    The Court of Appeal decision**[11]

12      In rejecting Petitioner's *Wheeler/Batson* claim, the California Court of Appeal
13  reasoned as follows:

14          At the threshold, [Petitioner] argues that the trial court did not make a
15          "sincere and reasoned attempt to evaluate each stated reason" for the
16          peremptory challenge (*People v. Silva*, supra, 25 Cal.4th at p. 386). The
17          record does not support this contention. The trial court did not accept the
18          prosecutor's asserted reasons at face value, but questioned her about each
19          reason, and elicited a clarification from her as to why she had not excused
20          another juror who had served on a hung jury. Because the trial court made
21          the requisite sincere and reasoned evaluation (*see People v. Williams* (1997)
22          16 Cal. 4th 153, 189), we review its determinations for the existence of
23          substantial evidence. Under that standard, we find no error.

24  _____

25      [11] Under *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991), it may be presumed that
26  the California Supreme Court, by its silent denial of petitioner's Petition for Review
    raising the same claim, did not intend to change the California Court of Appeal's reasoned
27  decision rejecting it.

28

[Petitioner] contends that the prosecutor's asserted grounds for exercising the peremptory challenge were pretextual because [the Juror] never indicated she was responsible for hanging the jury in the murder trial, and she otherwise stated that gangs engage in wrongful and disruptive conduct. We disagree. That [the Juror] had served on a hung jury in a case involving a serious felony is itself an adequate race-neutral basis for the peremptory challenge, regardless of whether she was known to be responsible for the deadlock. (*See People v. Rodriguez* (1999) 76 Cal. App. 4th 1093, 1108, 1114.) In addition, her incarcerated relatives constitute an adequate race-neutral basis (*ibid.*), as do her occupational relationships with Crips, in view of the gang-related allegations against Willie (*see People v. Landry* (1996) 49 Cal. App. 4th 785, 789–790; *People v. Perez* (1996) 48 Cal. App. 4th 1310, 1314–1315).

[Petitioner] notes that the prosecutor repeatedly accepted Prospective Juror No. 1, who had also served on a hung jury, before exercising a peremptory challenge against him. During voir dire, Prospective Juror No. 1 stated that he had previously served on several juries, all of which had reached a decision, with the exception of a jury in a shoplifting case. Because shoplifting is a considerably less serious offense than those charged in the underlying case, the record establishes that the prospective juror fell outside the prosecutor's stated concerns about prior jury performance.

(Lodgment D at 9–10.)

Although the Court of Appeal also relied on its belief that the prosecutor "accepted [the Juror] several times before excusing her" to support an "inference that the prosecutor properly exercised her challenge in response to the dynamics of the jury selection process and not on the basis of racial bias," (*id.* 10-11,) the record actually reflects that the prosecutor struck the Juror at her first opportunity to do so. (*See* 1 RT 158, 203, 221; 2 RT

17

1  257.)  Notwithstanding this error, however, the Court of Appeal reasonably concluded that

2  the trial court's denial of the Petitioner's *Batson* motion was proper.

3

4  **D.  Analysis**

5  The prosecutor proffered three reasons for striking the Juror: 1) the juror had hung

6  the jury in a serious case; 2) she served and helped Crips; and 3) she had two cousins who

7  had been convicted of serious crimes.  (2 RT 260–63.)  At the third stage of the *Batson*

8  analysis, the trial court rejected two of the prosecutor's three proffered reasons for

9  excusing the Juror, finding that the only "legitimate" reason for excusing the juror was that

10  she had sat on a hung jury.  (2 RT 263.)  The Court of Appeal, however, found that the

11  incarceration of the prospective juror's relatives, as well as her "occupational

12  relationships" with the Crips were also adequate race-neutral reasons for her dismissal. [12]

13  (Lodgment D at 10.)  The Ninth Circuit has determined that "for AEDPA purposes, we

14  evaluate the state court's last reasoned decision as the basis for the state court's judgment."

15  *Ali*, 584 F.3d at 1181 n.5 (9th Cir. 2009).  Because the California Court of Appeal found

16  all three of the prosecutor's proffered reasons to be adequate, all three are considered here.

17

18  1.  *The Juror previously served on a hung jury.*

19

20

21  _____

22  [12] Although a determination of a prosecutor's credibility "lie[s] peculiarly within a trial
   judge's province," *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal quotation

23  marks and citation omitted), the Court of Appeal's determination that the Juror's
   incarcerated relatives and occupational relationships with Crips also constituted adequate

24  race-neutral bases for striking the Juror was not a rejection of any credibility determination
   by the trial court.  Indeed, the record does not reflect that the trial court denied these two

25  proffered reasons based on the prosecutor's credibility, or that the trial court made a
   credibility determination whatsoever.  Rather, the Court of Appeal reversed the trial

26  court's erroneous legal conclusion that the "only" legitimate basis for denying the *Wheeler*

27  motion was that the Juror had served on a hung jury.  (2 RT 263.)

28

The trial court found that the Juror's service on a hung jury was a sufficient reason to strike her.  (2 RT 263.)  On direct appeal the California Court of Appeal found that service on a hung jury is a legitimate, non-racial basis for striking a potential juror. (Lodgment D at 10.)  In addition to the Juror, two other prospective jurors stated that they had served on hung juries.  Juror No. 1975 (also appearing in the record as Prospective Juror No. 14) stated that he had served on a jury that could not reach a verdict on a murder charge but that it ultimately was able to resolve the case to a manslaughter conviction, (2 RT 304,) and the first Prospective Juror No. 1 stated that he had served on a hung jury in a shoplifting case.  The prosecutor asked Juror No. 1975 whether he agreed that, "[O]ne of the goals of the justice system is to make every reasonable attempt to reach a unanimous verdict."  (2 RT 315.)  He responded, "Yes."  (*Id.*)  Similarly, the prosecutor inquired of the first Prospective Juror No. 1 whether he agreed that it was an important goal of the jury system to try to reach an unanimous verdict, whether he would make all reasonable efforts to reach a verdict if chosen as a juror, and whether his experience on a hung jury would influence him.  (1 RT 141.)

Although the prosecutor did not ask the Juror any similar follow-up questions, the record indicates that there is a reasonable basis to find that she was not similarly situated to either of these two jurors.  Unlike the hung jury in the murder trial on which the Juror sat, Juror No. 1975's previous jury was ultimately able to reach a verdict.  And Prospective Juror No. 1 can reasonably be distinguished from the Juror because Prospective Juror No. 1's hung jury involved a shoplifting case, not a murder.  The prosecutor stated that she excused the Juror because she hung in "a serious case," (2RT at 260–61,) suggesting that a hung jury in a more minor case would be less cause for concern.

Although the California Court of Appeal declined to engage in a full comparative analysis, its opinion did note that Prospective Juror No. 1 had served on several other juries that had reached verdicts and noted that since shoplifting is a considerably less serious offense than the one Mr. Brown was charged with, Prospective Juror No. 1 fell

outside the prosecutor's stated concerns about jury performance.  (Lodgment D at 9–11.)
There is therefore no basis to find that the Court of Appeal's decision to uphold the trial
court ruling was unreasonable.

### 2.  *The Juror served and helped Crips at her job.*

When the prosecutor suggested that the fact that the Juror "serves and helps Crips"
was "enough" to justify her use of a peremptory challenge against her (2 RT 261), the trial
court inquired, "What's she supposed to do as a health practitioner when a person is
injured and happens to be a gang member?"  (2 RT 261.)  The prosecutor responded that
the juror was supposed to serve and help Crips but that the prosecutor was not going to
keep the Juror when the allegation was that the defendant was a Crip, that the prosecutor
did not know how close the Juror had become with any of them, and that the Juror was
"getting intimate when she is treating them."  (2 RT 261.)  When the trial court noted that
the prosecutor had not asked the Juror whether she had become intimate with them, the
prosecutor clarified that she meant intimate in touching and "dealing with them" in the
Juror's profession.  (2 RT 261.)  The record reveals that the extent of the prosecutor's
questioning of the Juror on this issue was as follows:

| | |
|---|---|
| [Prosecutor]: | [Directed to all prospective jurors:]  Any contact with gang members?  Perhaps living in an area where gang members are present or at work or being intimidated by anyone you thought was a gang member? |
| [The Juror]: | I have a history of working in a trauma center, so there was [sic] gang members as our patients often. |
| [Prosecutor]: | Any problems at the time dealing with patients that were gang members? |
| [The Juror]: | Not particularly, no.  Just the contact. |
| [. . .] | |

20

| | | |
|---|---|---|
| [Prosecutor]: | [The Juror], in the trauma center did you treat any Crips? |
| [The Juror]: | Yes. |
| [Prosecutor]: | How did you know they were Crips? |
| [The Juror]: | Umm, they don't mind telling you that they are affiliated with a gang. |
| [Prosecutor]: | Did you see any tattoos? |
| [The Juror]: | Yes. |
| [. . .] | |
| [Prosecutor]: | How do you feel about gangs? |
| [The Juror]: | Umm, they do a lot that's wrong and disrupt our society. |

(2 RT 209, 217–18.)

This colloquy does not support the prosecutor's assumptions about the Juror's "close" relationships with gang members but it does indicate that the Juror treated gang members at the trauma center in her capacity as a physical therapist. Concerns over this close contact with members of the same gang as one of the defendants can provide a valid race-neutral basis for a peremptory strike.

Comparative analysis indicates that no other prospective juror had similar contact with Crips. Juror 2275 stated that she had contact with with gang members, but it is distinguishable. Juror 2275's son played college football and there were gang members on his team. (2 RT 308–09.) She stated that they were "excellent football players" and that on the field her son had a good experience with them, but added that she had advised her son to not hang out with them off the field so as to not end up in the wrong place at the wrong time. (*Id.*) The prosecutor did not strike Juror No. 2275 but her experience with gang members differs from the Juror in two respects: it was indirect rather than direct, and it did not involve helping them in any way whatsoever. In addition, the Juror No. 2275's warning to her son not to hang out with gang members off the field is a clear sign that her

experience with them was not positive.   Juror 2275 also indicated that her father was a New York Police Department detective, and that he later became an attorney and worked in the Manhattan district attorney's office, factors that would weigh against striking her.  (2 RT 309)

While the Juror did note that gang members "do a lot of wrong and disrupt society," her direct assistance to them when they are at their most vulnerable are nonetheless race-neutral reasons to strike her from the jury.  The Supreme Court's decision in *Miller-El II* indicates that if a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black person who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.  *Miller-El II*, 545 U.S. at 241.  Here, however, striking the Juror because of her direct assistance to gang members does not apply "just as well" to Juror No. 2275.  Thus, the California Court of Appeal was not unreasonable in finding that the Juror's contact with Crips through her job provided an additional race-neutral basis for striking her.

### 3. *The Juror had two cousins convicted of serious crimes.*

The prosecutor also indicated that she dismissed the Juror because the Juror had a cousin who was, in the Juror's words, "basically . . . a career criminal."  (1 RT at 206.)  The Juror noted that this cousin had been arrested for armed robbery and was in prison based on three strikes, and that she had another cousin who had been convicted of vehicular manslaughter.  (*Id.*)

The trial court inquired whether that justification meant that the prosecutor would not accept any of the jurors who had friends or relatives with convictions.  (2 RT 262.)  The prosecutor responded that this case involved an armed robbery and suggested that the Juror's first cousin's conviction was "probably" the reason why the Juror "hung" the murder case in which she previously was a juror.  (2 RT 262.)  Petitioner's counsel responded that they "did not know that."  (*Id.*)  Although the prosecutor's assumption that

the Juror hung the jury in her murder case because of her cousin's robbery conviction was unsupported by the record, the Juror's cousin's conviction and incarceration resulting from the same offense for which defendants were being tried provides a valid race-neutral basis to dismiss her.

Several other jurors said they had relatives who had been convicted of crimes but none of them responded that one of their relatives had been convicted of the very crime that was at issue at trial or a similar violent crime.[13] While the prosecutor asked follow-up questions of some of the jurors about whether they could be fair, it is unremarkable that she did not ask similar follow-ups to the Juror once she heard that the Juror's first cousin had been convicted of armed robbery and determined that this warranted a peremptory strike. Because the conviction constitutes a reasonable basis to strike the Juror and no similarly-situated juror was treated differently, the California Court of Appeal's determination that this was an acceptable reason to strike the Juror is clearly reasonable.

## VI. CONCLUSION

The prosecutor offered three race-neutral reasons for striking the Juror and the California Court of Appeal found all three reasons to be adequate. Having conducted the required comparative analysis, the Court finds that no jurors were similarly situated to the Juror with respect to any of the three reasons the prosecutor offered for striking her.

---

[13] Several jurors stated they had relatives with DUI convictions. (2 RT 252; 2 RT 272; 2 RT 313.) Juror No. 1298, who sat on the jury, revealed that her son had been charged with forging checks. (2 RT 237–39.) Juror No. 2438 indicated that his brother had been convicted of a crime many years ago, but that he knew nothing about it and that they were living in different states at the time. (2 RT 285–86.)

1  Though the California Court of Appeal declined to conduct a comparative analysis, the

2  Court finds that had it done so, it could reasonably have reached the same conclusion: that

3  the trial court's denial of the Petitioner's *Batson* motion was proper.  Accordingly, the

4  Court denies Mr. Brown's petition for *habeas corpus*.

7  DATED: July 19, 2011                    **JOSEPHINE STATON TUCKER**

8                                           JOSEPHINE STATON TUCKER
                                        UNITED STATES DISTRICT JUDGE